

# THE ATTORNEY GENERAL
# OF TEXAS

### AUSTIN 11, TEXAS

**WILL WILSON**
**ATTORNEY GENERAL**

August 17, 1962

Mr. J. W. Edgar
Commissioner of Education
Texas Education Agency
Austin, Texas

Opinion No. WW-1417

Re: Whether the term "telegraph lines" as used in Texas Statutes (Article 1416, et seq.) may be construed to include television lines, which transmit messages by wires acted on by electricity, and related questions.

Dear Mr. Edgar:

From your letter requesting the opinion of this office on the above-captioned matter, and from a file which you submitted in connection with your request, we have been appraised of the following facts.

An independent school district (Galveston) under a lease agreement which expired on June 15, 1962, had installed and was operating a two-way closed circuit television system covering its school administration building and eight elementary schools. Phonoscope, Inc. (Galveston), a Texas corporation, developed and leased this system to the school district. The facilities provided constitute a valuable instructional aid in the teaching and educational program of the district.

This communication system, audio and video, allows a two-way sound and picture between remote points. Transmission of picture and audio carriers is accomplished via a coaxial cable. Communication may be on a private basis between any two points, or on a mass basis between any number of points.

The necessary coaxial cable for this operation must extend from the central studio (switchboard) to the various distribution points; the cable being affixed to poles existing or added, or laid underground. From an operational standpoint it is feasible to use cable and pole facilities of a telephone company, where such company is willing to contract for such

use.  Because contract terms with Southwestern Bell Telephone
Company could not be reached, Phonoscope's only alternative
has been to seek franchises from various cities as a public
service or utility corporation to allow it to obtain necessary
right-of-way, erection and maintenance of poles and cables.

The school district desired to avail itself of this
valuable educational program aid in the future.  Therefore,
its plan is to request and urge the City Council to grant
Phonoscope, Inc., a franchise under the terms of Article 1416,
et seq., providing that this system is held to be within the
coverage of these articles.

Your first question reads as follows:

"1.  May the term 'telegraph lines' used in
Texas Statutes (Article 1416, et seq.) be
construed to include television lines, which
transmit messages by wires acted on by elec-
tricity?"

Relating the above statement of facts to your first question,
it becomes apparent that the effect of this opinion will be
limited to closed circuit audio-video communications systems
used solely for public education.

The statutes involved are Articles 1416 through
1432 inclusive, Vernon's Civil Statutes.  Some background
information concerning the judicial interpretation of Articles
1416 and 1417 is necessary in order to explain our answer
more clearly.

Articles 1416 and 1417 were originally enacted in
1874, and were carried forward in successive codifications,
remaining substantially unchanged today.  These articles
read as follows:

"Article 1416.  1231, 698, 622 Public ways:   Use
Corporations created for the purpose of
constructing and maintaining magnetic tele-
graph lines, are authorized to set their
poles, piers, abutments, wires and other
fixtures along, upon and across any of the
public roads, streets and waters of this
State, in such manner as not to incommode

the public in the use of such roads, streets,
and waters.  Acts 1874, p. 132; G.L. vol. 8,
p. 134."

"Article 1417.  1332, 699, 623 Right of Way
    They may also enter upon any lands owned
by private persons or by a corporation, in
fee or less estate, for the purpose of making
preliminary surveys and examinations with
a view to the erection of any telegraph
line, and from time to time appropriate so
much of said lands as may be necessary to
erect such poles, piers, abutments, wires,
and other necessary fixtures for a magnetic
telegraph, and to make such changes of loca-
tion of any part of said lines as may from
time to time be deemed necessary, and shall
have a right of access to construct said
line, and when erected, from time to time
as may be required, to repair the same, and
shall have the right of eminent domain to
obtain the right of way and condemn lands
for the use of the corporation.  Id."

Telephone companies were not included within the coverage of
the statute for the simple reason that in 1874, telephones
had been recently invented, and were not generally known; and
it cannot be supposed that the legislature had telephones in
mind when it used the word "telegraph."

    In 1900, the Supreme Court of Texas, in San Antonio
& A.P.Ry. Co. v. Southwestern Telegraph and Telephone Co.,
55 S.W. 117, had squarely before it the question of whether
or not the two articles above quoted also covered telephone
companies.  In declaring that the articles did apply to like
proceedings by telephone companies, the court based its
reasoning on its interpretation of subsequent legislation
providing that a corporation could incorporate for the purposes
of constructing and operating "a telegraph and telephone line."
In construing this legislation, the Court stated:

        "The structure of this sentence indicates
        that the legislature understood that 'telegraph'
        and 'telephone' were closely related in meaning,
        and in fact so consistent with each other that

the two words were used to express different
modes of accomplishing the one purpose, --
the transmission of messages by means of
electricity."  (Emphasis added)

In 1898, two years prior to the above cited case,
a Texas Court of Civil Appeals had before it, in Gulf, C.
& S.F.Ry. Co. v. Southwestern Telegraph & Telephone Co.,
45 S.W. 151 (no writ history), the same issue of whether
or not telephone companies were covered by what are now
Articles 1416 and 1417.  The Texas Court, citing foreign
cases and authorities, and adopting the rules set out therein,
stated:

"We are of the opinion that the decisions
cited are founded upon common sense and reason,
and that the term 'telegraph lines', used in
the statute, includes 'telephone lines,' each
one being constructed for the same purpose,
namely, the transmission of messages by wires
acted on by electricity."  (Emphasis added)

Looking behind the results of these two early Texas
cases and the many later cases adopting the rule set out there-
in, it is clear that paramount in the reasoning of the court
was the enormous technological advancement in the field of
communications caused by the advent of the telephone.  It
should be pointed out that at the time of these first two
Texas decisions, the technological development of the tele-
phone was at a much lower stage than is the present day
development of television.  And yet, the Texas courts, as
well as other state courts with similar questions confronting
them, recognized the vast potential benefit to the general
public that the telephone system offered.

Recognizing the benefits that our educational
system derives from closed circuit television in the public
schools, and adopting the reasoning of the Texas courts
faced with the "telephone issue," we answer your first
question in the affirmative.  The basis of this answer is
an examination of the technology of the closed circuit system
in question.  The facts clearly show that stripped of the
label "television," this communications system is of the
same nature as the telephone system, but on a more limited
scale and with pictures added; i.e., it is merely an

advancement or improvement in the art of telegraphy and telephony, with the same purpose of transmitting messages by wires acted on by electricity.

The fact that this system is limited to the school system does not prevent it from being operated for the public use and benefit. The San Antonio Court of Civil Appeals, in West v. Whitehead, 238S.W. 976, (1921, error ref.), declared:

"The question of whether or not in a given case the use is a public one depends upon the character, and not the extent, of such use."

Clearly, the character of the public school system falls within the category of public usefulness and benefit. This category would obviously extend to any facilities used to improve educational methods and procedures.

Your second question reads as follows:

"2. Is a company organized and incorporated for the purpose of supplying the public with two-way audio-video communications, one having the character of a public utility, with attendant rights of eminent domain, and entitled to the granting of a franchise by the proper political subdivisions of the State for such purpose?"

We assume that his question also refers to a company which would provide the above described services to the public schools. Our answer to your first question places this type of company within the coverage of Article 1416, et seq. These articles fully set out and explain the rights and obligations of such companies; and, for this reason, it is unnecessary to answer this question.

Your third question reads as follows:

"3. Is a company organized and incorporated to supply the public with community antenna television system, one having the character of a public utility, with attendant right of eminent domain and entitled to the granting of a franchise by the proper political subdivision

of the State for such purpose?"

Your opinion request indicates that the service provided by this type of company would be for use primarily in homes, and for entertainment purposes. We, therefore, have no jurisdiction to answer this question.

## SUMMARY

A two-way audio-video communications system for use in the public schools is merely an advancement or improvement in the art of telegraphy and telephony, with the same purpose of transmitting messages by wires acted on by electricity; and corporations organized to operate such a system come within the coverage of Article 1416, et seq.

Yours very truly,

WILL WILSON
Attorney General of Texas

By *J. Gordon Zuber*
J. Gordon Zuber
Assistant Attorney General

JGZ:ms

APPROVED:

OPINION COMMITTEE:
W. V. Geppert, Chairman

Morgan Nesbitt
Sam Stone
Elmer McVey
Henry Braswell

REVIEWED FOR THE ATTORNEY GENERAL
BY: Leonard Passmore